DECISION
{¶ 1} David Baker filed this action in mandamus seeking a writ which compels the Industrial Commission of Ohio ("commission") to vacate its order denying his application for permanent total disability ("PTD") compensation and to enter a new order granting the compensation.
 {¶ 2} In accord with Loc.R. 12(M), the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision which contains a recommendation that we deny the requested relief. (Attached as Exhibit A.)
 {¶ 3} Counsel for Mr. Baker has filed objections to the magistrate's decision. Counsel for the commission has filed a memorandum in response. The case is now before the court for a full, independent review.
 {¶ 4} Counsel for Mr. Baker argued before the magistrate that the two primary reports upon which the commission's order was based the reports of Michael A. Murphy, Ph.D., and Jerry Olsheski, Ph.D. do not constitute "some evidence" to support the commission's order.
{¶ 5 Dr. Murphy's report is extremely detailed. The report runs some seven pages, but has some content which is troubling. For instance, under the heading "Mental Status Examination," he reports:
 {¶ 6} "Affectively, the Claimant exhibited a depressed mood. Depressive cognition was not present. Depressive cognition was present, including vague suicidal thoughts, helplessness, and hopelessness."
 {¶ 7} Since the report continues on to discuss the various forms of depressive cognition exhibited by Mr. Baker, we can only assume that Dr. Murphy made a mistake in reporting an absence of depressive cognition. The mistake does not deprive the report of all evidentiary value.
 {¶ 8} Jerry Olsheski, Ph.D., undertakes a detailed analysis of Mr. Baker's employment potential given the various reports in the file. Dr. Olsheski lists five possible jobs, none of which require transferable skills from his employment as a truck driver. The report has some evidentiary value, depending upon which psychological or psychiatric reports are viewed as persuasive.
 {¶ 9} In his objection, counsel for Mr. Baker expresses concern about the fact that the report of his vocational consultant, Beal Lowe, Ph.D., is never mentioned or evaluated. Counsel views this as a violation of State ex rel. Fultz v. Indus. Comm. (1994), 69 Ohio St.3d 327. Although the better practice might be for staff hearing officers to list all the reports they consider, current case law does not require this. Appellate courts presume that hearing officers review all the reports and discuss only the reports upon which they rely.
 {¶ 10} The objections to the magistrate's decision are overruled. We adopt the findings of fact and conclusions of law contained in the magistrate's decision. As a result, we deny the requested relief.
Objections overruled; writ denied.
BROWN and KLATT, JJ., concur.
 IN MANDAMUS {¶ 11} Relator, David Baker, filed this original action asking the court to issue a writ of mandamus compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying his application for compensation for permanent total disability ("PTD") and to issue an order granting the requested compensation.
Findings of Fact:
 {¶ 12} 1. In 1995, David Baker ("claimant") sustained industrial injuries. His workers' compensation claim was allowed for numerous conditions, including lumbar sprain, cervical disc conditions, major depression and post-traumatic stress disorder.
 {¶ 13} 2. In 2001, claimant filed a PTD application, indicating that he was about 50 years old, had completed the ninth grade and could do basic math. He said he could read and write although not well. His application was supported by a medical opinion from Franklin M. Halley, M.D.
 {¶ 14} 3. In October 2001, claimant was examined by Stephen Duritsch, M.D., who opined that the allowed physical conditions limited claimant to sedentary work.
 {¶ 15} 4. In November 2001, claimant was examined by Michael Murphy, Ph.D., who provided an extensive report in regard to the allowed psychological conditions. He reported, in part:
 {¶ 16} "Claim Allowances: Contusion chest wall; Contusion of thigh (bilateral); Cervical disc displacement C5-C6; Sprain lumbar region; Disc herniation C4-C5, left; Cervical spondylosis C3 to C7; Major Depression, Post-Traumatic Stress Disorder.
 {¶ 17} "* * * I accept the allowed conditions in the claim. * * *"
 {¶ 18} 5. Dr. Murphy provided a lengthy review of the history of claimant's allowed conditions, explaining how the accident occurred and reciting the treatment history at length. He noted that he had reviewed the entire medical file provided to him and summarized the reports of four psychologists/psychiatrists.
 {¶ 19} 6. Dr. Murphy also described claimant's occupational history and then related aspects of his medical history unrelated to the industrial injury.
 {¶ 20} "* * * Surgeries unrelated to the injury include appendectomy, and three cardiac stints (1998). Unrelated medical conditions include diabetes (diagnosed in 2000) and two heart attacks (1998, 2000). Current medications for these conditions include Atenolol, Imdur, Glucotrol, and Zocor. He has no other BWC claims."
 {¶ 21} 7. In regard to claimant's family and developmental history, Dr. Murphy included the following:
 {¶ 22} "* * * [M]arital problems * * * have been reported in earlier evaluations (see Drs. Schultz, Moon, and Skillings).
 {¶ 23} "* * *
 {¶ 24} "The Claimant is in his fifth marriage of 14 years. His first marriage lasted two years. He was divorced in 1971. He stated, `She was overly neat. She left for somebody else.' He married for the second time at age 20 and was married for two years. He divorced in 1973 because of `my drinking problems.' He was married for the third time at age 27 for 2½ years. He divorced in 1980. He stated, `We had a lot of parties.' He remarried his third wife in 1986 and was married for another three years. He has one son from that marriage. He and his present wife have one adopted daughter (age 7), three foster children, and two stepchildren. * * * He denied any marital conflict. He indicated that his marital problems had been distorted by previous examiners."
 {¶ 25} 8. The results of the mental status examination were as follows, in part:
 {¶ 26} "Mental Status Examination: Cognitively, the Claimant appeared to be a man of below average intelligence. He was alert and oriented in all spheres, with adequate reality contact. Mild deficits in concentration and attention were noted. Comprehension of simple commands was unimpaired. Stream of thought and flow of ideas were slowed, but coherent. Educational deficits were present (he has an 8th grade education). There was no evidence of neurological impairment. The Claimant did not show evidence of difficulty with hand-eye coordination. There was evidence of cognitive disturbance. He reported auditory hallucinations. He stated, `I used to hear voices. I didn't tell. I deserved to live. It's coming back a bit. I have a lot of pain.' He was not currently preoccupied with suicidal thoughts. His thoughts were clear, understandable, relevant, and goal-directed. There was no tangentiality, circumstantiality, or disturbances of logic. His associations were reasonably well organized. The Claimant answered questions appropriately. Deficits in memory were noted, specifically in short-term memory. He stated, `I forget what happened. I don't sustain interest. I'm focused on my back.' Long-term memory was intact. The Claimant could recall time frames. He gave an account of his life events in chronological order. He was a fair historian. Abstract reasoning, concept formation, and fund of knowledge were estimated to be below average. He had a functional understanding of everyday objects. His judgment was not impaired. Executive functions such as decision making, flexibility, and social perceptions were generally intact and estimated to be below average. Insight was limited. The Claimant was not psychologically minded.
 {¶ 27} "Affectively, the Claimant exhibited a depressed mood. Depressive cognition was not present. Depressive cognition was present, including vague suicidal thoughts, helplessness, and hopelessness. He reported a loss of interests, little or no desire, a loss of pleasure, and feeling sad and downhearted. He stated, `I'm upset with myself and my back. I have no guilt.' He denied symptoms of anxiety. He stated, `I'm on a lot of medications.' Symptoms of post-traumatic stress were present. He stated, `I have nightmares now, on occasion. The medications are helpful. I have some flashbacks. I hear loud noises.' He reported being hypervigilant. Phobic tendencies were absent. The Claimant has been tried on psychotropic medication, and currently takes Prozac, Amitriptyline, Seraquel, and Zyprexia. Seraquel and Zyprexa are both antipsychotics with common side effect of dizziness, drowsiness, insomnia, and headaches.
 {¶ 28} "* * *
 {¶ 29} "Behaviorally, the Claimant has not attempted suicide, but has expressed suicidal ideation. There was a legal history. He owed child support in the 1970's (from his first marriage). He stated, `I paid it back.' He denied the current use of illicit drugs and excessive alcohol, and tobacco. He reported some heavy alcohol use in the past. He stated, `Now I'm a social drinker.' * * *"
 {¶ 30} 9. Dr. Murphy also noted that claimant's mental status was affected by stressors unrelated to his industrial injury:
 {¶ 31} "* * * He stated, `I lost my friends after the injury. Two days after my injury, my pastor died of heart problems.' Unrelated life stressors impacting the Claimant include death of his mother (1999 — He stated, `I took it real hard.'); 8th grade education, married five times (He denied marital distress although this was observed by Drs. Moon, Skillings, and Schultz), and loss of pastor (1995). Unrelated medical conditions impacting the Claimant include diabetes (2000) and heart attacks (1998, 2000). He is also on anti-psychotic medication for unrelated thought disturbance."
 {¶ 32} 10. In a lengthy discussion, Dr. Murphy discussed the results of the Millon Clinical Multiaxial Inventory. Under different categories, Dr. Murphy listed the results and then noted the diagnoses typically associated with those scores according to Millon. For example, under the subheading "Personality Style," Dr. Murphy noted that claimant showed markedly dependent features on the inventory and that, based on the scores, the inventory suggested a possible diagnosis of "Personality Disorder Not Otherwise Specified, dependent traits."
 {¶ 33} Under the subheading "Clinical Syndromes," Dr. Murphy noted that claimant had reported manic-like symptoms and symptoms associated with dysthymia. According to Millon, diagnoses of major depression and dysthymia disorder are most commonly associated with scores such as claimant's, and he therefore noted possible diagnoses of "r/o Dysthymic Disorder, r/o Major Depression." However, the inventory recommended a thorough clinical examination to confirm an actual diagnosis.
 {¶ 34} Dr. Murphy further noted that claimant reported symptoms associated with post-traumatic stress. Millon noted that trauma could be physical or emotional and that a lack of physical trauma would indicate an emotional problem. Although the inventory scores suggested a possible diagnosis of "Post-Traumatic Stress Disorder," Millon recommended a clinical evaluation to determine symptoms and impairment.
 {¶ 35} Dr. Murphy further noted that claimant reported mild cognitive dysfunction on the inventory but it was not severe enough to impair functioning, and that claimant also reported mild symptoms associated with delusional disorder. but that the symptoms were not of sufficient severity to justify a diagnosis.
 {¶ 36} 11. Last, Dr. Murphy set forth his analysis, diagnosis, and opinion:
 {¶ 37} "Discussion: The Claimant sustained injury on 5/22/95, and had two injury-related surgeries. He last worked in 7/95. He continues to hold his CDL. Unrelated psychological stressors are present, including five marriages. He became agitated when discussing his present marital status. He is diabetic and has had two heart attacks (1998 and 2000). Cardiac stints have been surgically implemented (1998). Unrelated to his claim are his declining cardiac health, combined with marital distress and continued use of alcohol, which have precipitated thought disturbance (i.e., auditory hallucinations). His continued use of alcohol with his multiple medications is ill advised. I also note the antipsychotic medication may be producing insomnia, sedation, and headaches, mimicking depression. His unrelated health problems are a principle clinical concern at present. He has participated in psychological and psychiatric services with multiple providers.
 {¶ 38} "Diagnosis: Major Depression, Post-Traumatic Stress Disorder (both conditions allowed by the DHO on 4/26/99).
 {¶ 39} "Opinion: The following opinion is based on a reasonable degree of psychological certainty.
 {¶ 40} "* * *
 {¶ 41} "Utilizing the AMA Guides to the Evaluation of Permanent Impairment (4th edition), I would ascribe a PPI % for the following conditions:
 {¶ 42} "1) Major Depression — 10%
 {¶ 43} "2) Post-Traumatic Stress Disorder — 8%
 {¶ 44} "3) Combined Effects — 17%
 {¶ 45} "* * *
 {¶ 46} "The Claimant's psychological impairments are not work-prohibitive. He is psychologically capable of functioning in his former capacity. He continues to hold his CDL. He is able to sustain competitive employment. His unrelated stressors discussed above and unrelated medical problems, including his thought disturbance, are causal to his inability to sustain employment at present."
 {¶ 47} 12. In February 2002, a PTD hearing was held, resulting in a denial of compensation. In reaching its decision, the commission relied on evidence including the reports of Drs. Murphy and Jerry Olsheski.
Conclusions of Law:
 {¶ 48} In this original action in mandamus, claimant asserts that the commission abused its discretion in denying his PTD application. He contends that neither the medical report of Dr. Murphy nor the vocational report of Dr. Olsheski constituted "some evidence" on which the commission could rely. For the reasons discussed below, the magistrate disagrees.
 {¶ 49} With respect to Dr. Murphy, claimant argues that he repeatedly minimized or even entirely denied the current effects of the allowed conditions on claimant's functioning. Claimant argues that the allowed psychological conditions were not "actually considered" by the psychologist. Claimant further argues that Dr. Murphy, in considering whether claimant was capable of returning to work, impermissibly considered nonallowed conditions.
 {¶ 50} Several legal principles apply. First, it is well settled that an award of compensation may not be based, even in part, on a nonallowed medical factor. E.g., State ex rel. Erico Products, Inc. v. Indus. Comm. (1994), 70 Ohio St.3d 661. However, the existence of a disabling nonallowed condition does not preclude a PTD award. The question is whether the allowed conditions in and of themselves prevent the claimant from engaging in sustained remunerative employment, regardless of any nonallowed conditions. State ex rel. Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452; State ex rel. Quarto Mining Co. v. Foreman (1997), 79 Ohio St.3d 78; State ex rel. Byrd v. Am. Std., Inc. (1997), 78 Ohio St.3d 504; State ex rel. Whetstone v. Bonded Oil Co. (1995), 73 Ohio St.3d 205.
 {¶ 51} Accordingly, when a doctor opines that a claimant has sustained an industrial disability based in part on a nonallowed condition, that medical report cannot constitute "some evidence" to support an award of compensation. E.g., State ex rel. Stone Container Corp. v. Indus. Comm. (1997), 79 Ohio St.3d 163; State ex rel. Shields v. Indus. Comm. (1996), 74 Ohio St.3d 264.
 {¶ 52} However, a doctor may mention the presence of nonallowed conditions in passing, or may discuss them in a comprehensive evaluation, and such commentary does not automatically disqualify the report from consideration. As long as the doctor does not rely on a nonallowed condition in rendering the opinion on injury-related impairment, the report is not barred from evidentiary consideration. Quarto, supra; State ex rel. Consolidation Coal Co. v. Indus. Comm. (1997), 78 Ohio St.3d 176. In other words, a medical report constitutes "some evidence" on which the commission may rely where the ultimate opinion on the issue of compensable disability is based solely on the allowed condition in and of itself. Moreover, the Ohio Supreme Court has made clear that a doctor need not expressly exclude consideration of nonallowed conditions. State ex rel. Eaton Corp. v. Indus. Comm. (1997),80 Ohio St.3d 352; Consolidation Coal, supra.
 {¶ 53} In the present matter, Dr. Murphy discussed claimant's entire psychological history and current status in a lengthy report. He made clear in the introduction to his report that he understood and accepted the conditions allowed in the claim. In the body of his report, he delineated between allowed conditions and conditions unrelated to the industrial injury, which is reasonable under Waddle principles. There is no indication in the report that Dr. Murphy relied on a nonallowed condition in evaluating the extent of injury-related impairment in the workers' compensation claim. His report is not barred under Shields and Stone Container, supra.
 {¶ 54} Claimant also suggests that Dr. Murphy refused to accept the allowed conditions because he discussed "possible" diagnoses. The magistrate finds no merit in this argument. In the report, Dr. Murphy made clear that the diagnoses suggested by the Millon inventory were subject to confirmation pursuant to a thorough clinical evaluation. His discussion of the inventory was simply a review of the test responses with a listing of potential diagnoses suggested by the scores. Dr. Murphy made clear that no final diagnosis could be made without a clinical examination and evaluation, and his report includes a description of a thorough examination and evaluation, followed by a final diagnosis. Finally, in the section where he set forth his final conclusions, Dr. Murphy stated his actual diagnoses of major depression and post-traumatic stress disorder (the allowed conditions), and he then assessed impairment based on those conditions. Dr. Murphy plainly accepted the allowed conditions and based impairment on them.
 {¶ 55} Second, claimant argues that Dr. Murphy minimized the effects of the allowed conditions by not accepting what claimant told him during the interview. However, an examining doctor is expected to report his own clinical observations and to exercise his own professional judgment. State ex rel. Domjancic v. Indus. Comm. (1994),69 Ohio St.3d 693, 695-696. The magistrate sees no reason that a psychologist would be required to accept as accurate all the representations made by a claimant during a psychological evaluation. For example, Dr. Murphy noted repeatedly that claimant denied marital distress and use of alcohol, but Dr. Murphy chose to rely on medical reports in the file as well as his own observations and analysis. Given the nature of a psychological evaluation, the psychologist must remain free to assess all the factors, including the subject's statements, and there is no reason that the psychologist is bound by all the assertions the subject makes. A psychologist is qualified to render an opinion on matters such as the interview answers given by the person being examined, and Dr. Murphy's report is not defective because he noted claimant's assertions but did not rely on all of them. The commission, as the finder of fact, could choose to reject Dr. Murphy's opinions or find them persuasive.
 {¶ 56} Third, the magistrate finds no defect in Dr. Murphy's delineation between allowed conditions and conditions unrelated to the industrial accident. Where a claimant has impairment from allowed conditions as well as impairment from nonallowed conditions, an examining doctor is required to state an opinion as to the extent of impairment caused solely by the allowed conditions. Thus, doctors are faced with the difficult task of determining, in the presence of multiple conditions that may be disabling, the extent of impairment caused by only one or two of those conditions. Dr. Murphy in his conclusion stated with sufficient clarity that the impairment from the allowed psychological conditions did not prohibit a return to work and that claimant was able to sustain employment based solely on the allowed conditions. After stating his opinion on that issue, an opinion on which the commission could rely, he then added an additional opinion. He added a brief comment that claimant's inability to work was caused by problems unrelated to the industrial injury.
 {¶ 57} As stated above, Dr. Murphy's opinions based on the allowed conditions constituted some evidence on which the commission could rely. The magistrate acknowledges that Dr. Murphy also stated an opinion on the effect of other, unrelated psychological problems, a matter he was not required to address. Dr. Murphy's additional opinion was merely extraneous, and the commission did not rely on it. In sum, Dr. Murphy's additional commentary did not render his report fatally defective as a matter of law.
 {¶ 58} Next, claimant argues that Dr. Olsheski's report was defective because he did not provide a consideration of the combined effects of the psychological and physical conditions. However, the magistrate finds no defect that would remove the report from evidentiary consideration.
 {¶ 59} The duty to consider the combination of all the medical and vocational factors rests on the commission. Although the commission may obtain the assistance of a vocational expert if it chooses, the commission itself is a vocational evaluator with considerable expertise, and it may form its own independent opinion without regard to the opinions of vocational experts. E.g., State ex rel. Jackson v. Indus. Comm. (1997), 79 Ohio St.3d 266; State ex rel. Ewart v. Indus. Comm. (1996), 76 Ohio St.3d 139.
 {¶ 60} The magistrate is aware of no authority for the proposition that, when the commission retains a vocational expert, it must require the expert to provide opinions on the ultimate issues before the commission, such as the combined effect of the allowed conditions and vocational factors. As a practical matter, even where such a report would be desirable, it would require the vocational consultant to produce multiple opinions, because there would be numerous combinations of the various medical reports, as the consultant could not predict which combination of medical reports the commission would adopt. For example, in a case with three orthopedic reports and two psychological reports, the vocational consultant would be obliged to consider many different combinations of orthopedic and psychological opinions that the commission might adopt in order to provide a combined-effects analysis on which the commission might rely.
 {¶ 61} In sum, it does not appear unreasonable for the commission to retain a consultant to set forth the types of jobs that would be feasible under each doctor's restrictions and to set forth a discussion of each vocational factor individually, leaving it to the commission to perform the task of considering all the medical and nonmedical factors in combination.
 {¶ 62} Last, the magistrate notes that claimant raised a new issue in his reply brief, that the commission abused its discretion in failing to acknowledge the report of Dr. Beal Lowe. Setting aside the question of whether relator may raise a new issue in the reply brief, the magistrate notes that the facts do not support the issuance of a writ under State ex rel. Fultz v. Indus. Comm. (1994), 69 Ohio St.3d 327. The commission had no duty to discuss or even mention the evidence on which it did not rely. See, e.g., State ex rel. Bell v. Indus. Comm. (1995),72 Ohio St.3d 575; State ex rel. Lovell v. Indus. Comm. (1996),74 Ohio St.3d 250.
 {¶ 63} For the foregoing reasons, the magistrate recommends that the court deny the requested writ of mandamus.